**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Chadrick D. Mosley, | ) | **ORDER DENYING DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY** |
| Plaintiff, | ) | **JUDGMENT AND GRANTING** |
| | ) | **LEAVE TO AMEND COMPLAINT** |
| vs. | ) | **TO ASSERT CLAIM FOR** |
| | ) | **PUNITIVE DAMAGES** |
| Alpha Oil and Gas Services, Inc., | ) | |
| a North Dakota Corporation, et al. | ) | |
| | ) | Case No. 4:12-cv-056 |
| Defendant. | ) | |

Before the court are defendant's motion for summary judgment (Doc. No. 24) and plaintiff's motion to amend his complaint to add a claim for punitive damages (Doc. No. 26).  For the reasons set forth below, defendant's motion is denied and plaintiff's motion is granted.

**I.      BACKGROUND**

In September 2011, plaintiff Chadrick Mosley, an Oklahoma resident, began work for defendant Alpha Oil and Gas Services, Inc. ("Alpha") on a leg of the Garden Creek pipeline extending west from Watford City, North Dakota into Montana.  Alpha is a North Dakota corporation that does pipeline construction and service work, including construction of new oil and gas pipelines in North Dakota's oil fields.  Alpha's home office is located in Clearbrook, Minnesota.

Mosley obtained his job with Alpha through the assistance of his father, Chester Mosley, who had hired on with Alpha several months earlier and was working as a shop foreman at Alpha's shop in Watford City.  One of his father's duties as shop foreman was to order supplies and make them available for Alpha's crews, including, as will become relevant in this case, work safety equipment such as gloves, safety vests, hard hats, and taglines.

1

Within two to three weeks after being hired as a laborer, Mosley was promoted to "straw boss" on the pipe-bending crew that bent the pipe so it could follow the contour of the land when buried. The crew that Mosley worked on was comprised of 4 or 5 persons. The crew foreman was Kenneth Sims. Underneath him was Mosley, who was the straw boss. In addition, there was at any one time between 2 or 3 laborers. Mosley testified in his deposition that his duties as straw boss included taking the lead on the work being performed, completing safety reports for the morning safety meetings, and keeping the crew's time records.

One of the work activities that Mosley and the laborers on his crew would routinely perform involved guiding pipe that had been raised into the air by a side boom over to the bending machine and then, after the pipe was bent, guiding the suspended pipe to the location where it would be installed. In the trade, the process of moving the suspended pipe is referred to as "swamping."

As will be discussed in more detail later, OSHA regulations require that persons swamping suspended pipe use "taglines," which are ropes or cables that allow the person to guide the suspended pipe from a distance so that they are protected from injury should the pipe fall or swing out of control. Mosley contends that taglines were not being provided to his crew and that he complained about this on several occasions, to both foreman Sims and the Garden Creek project superintendent, Paige Quick. Mosley claims that, when he made these complaints, Sims would say he did not want to get involved and that Quick's response essentially was that taglines would only slow down the work and that, if the inspectors were present, he should throw a rope around the pipe and, if they were not, he and his crew should simply guide the pipe with their hands and get it swamped as fast as possible.

2

Mosley also contends that he complained to both Sims and Quick about the lack of colored safety vests, which OSHA regulations require when construction workers are working in a road right-of-way so that they are more visible and stand out to traffic and operating equipment. Mosley testified that foreman Sims again stated he was not going to get involved and that Quick told him that all of the vests they had were being used and that they were not going to get anymore.

Mosley claims he was injured on November 3, 2011, while swamping a section of pipe out of the bending machine by hand without a tagline. Mosley claims the pipe became unbalanced causing him to be thrown into the air and then land on the ground, injuring his neck, shoulders and back. Mosley states he continued working that day and for the next several days despite being stiff and sore. Mosley states that, when he did not get any better and his neck became more stiff, he insisted on going to a doctor to get checked out, despite Sims urging him to keep working because they were shorthanded. Mosley claims the doctor advised him not to work for a period of time and allow his injuries to heal.

When Mosley went to the doctor, he reported that his injury was work-related and he completed a form for obtaining workers' compensation benefits provided to him at the hospital. Mosley testified that the form was one of several that the hospital stated he needed to fill out and that he was not aware it was an actual application for benefits. In any event, when Mosley returned to Alpha's office and advised he could not immediately return to work, he and the owner of Alpha came to an agreement whereby, in lieu of Mosley claiming workers' compensation benefits, Alpha

would pay his medical expenses as well as two hours a day "show up" pay and per diem until he could return to work.[1]

Mosley returned to work on November 29, 2011.  According to Mosley, Quick's attitude towards him changed upon his return from being friendly to hostile.  According to Mosley, this included Quick rhetorically asking on the day of his return what was going to happen if Mosley claimed an injury again and whether they would have to care for his eight children.  Mosley interpreted this remark to mean that Quick was of the belief that Mosley would seek a bunch of money.

Mosley also claims that he inquired of Quick in a subsequent conversation about whether his medical bills had been paid.  According to Mosley, Quick responded by telling him that Alpha was not going to pay anything more.  Mosley claims he then stated to Quick that he would have to file a claim with workers' compensation to get his bills paid.  Mosley alleges in his complaint that this conversation took place on the night prior to his being fired, which would have been December 5, 2011, and both parties in their briefing assume this is when Mosley claims it took place. In reviewing Mosley's deposition testimony, however, this is not so clear.  At one point, Mosley appears to state that the conversation took place the day after he returned to work, which would have been November 30, 2011, some six days prior to his termination.

---

[1]  Alpha questions the extent of Mosley's injuries, whether his doctor actually recommended he not return to work - not even to light duty, and whether he needed to be out of work for the time period he was.  However, Alpha did not make an issue of these matters at the time.  In fact, Alpha allowed Mosley the time off, voluntarily provided him with compensation in lieu of his collecting workers' compensation, and then allowed him to return to work.  Consequently, the questions that Alpha raises now about the extent of Mosley's injuries and whether he was prohibited from working appear to be beside the point with respect to the issues raised in this lawsuit.

Mosley also claims there was an occasion after he had returned to work when he stopped into the shop to see his father and present were both superintendent Quick and Alpha's project manager for the Garden City pipeline, Torsten Leines.  Mosley claims he overheard Quick advise his father not to order any more gloves, hard hats, safety vests, or signs and, if signs were needed, to make them out of scrap lumber.  Mosley claims he checked with his father about ordering more safety supplies the day prior to his termination and his father advised that he could not order anything more because Alpha had taken away his credit card.

On December 6, 2011, a subcontractor working for Alpha on the Garden City project hit a power line while operating a backhoe without a spotter.  Alpha's "home office" safety director, David Vasilakes happened to be present in Watford City on that day along with another safety person to conduct first aid training.  After looking into the incident, Vasilakes decided to call a general safety meeting that evening for all of Alpha's employees who were working in the area.  The meeting was held in Alpha's multi-bay shop in Watford City, where Mosley's father was the shop foreman. Most of the witnesses agree that upwards of 40 or more persons were in attendance, including Mosley and his pipe bending crew, Mosley's father, superintendent Quick, and project manager Leines.  In order to conduct the meeting, Vasilakes positioned himself partway up an open stairway in the shop so he could  be seen and heard by the large number of persons gathered for the meeting.

There is sharp conflict between Mosley's evidence and Alpha's evidence as to what happened next.  Mosley testified in his deposition that Vasilakes started the meeting by talking about the incident that had occurred with the subcontractor and then opened up the meeting for employees to raise any safety concerns that they may have, stating that anyone who did so would not face any

5

adverse consequences.  Mosley claims he spoke up and complained that Alpha was no longer providing safety gloves, hard hats, and safety vests.  He also claims that he spoke out about the lack of taglines, the fact this was a big safety hazard and he had been injured because of the lack of taglines, and that taglines are required by OSHA's regulations.  He also claims he complained that Alpha had stopped providing cases of water on the jobsite.  Mosley states it was after he raised these subjects that superintendent Quick walked to the back of the room where Mosley was standing and stated as loud as he could to Mosley:  "It's not your f'ing problem no more because you're fired."

Mosley acknowledges that he became very angry and physically confronted Quick after he was fired, including head-butting Quick.  Mosley also acknowledges that his father had to drag him out of the shop after he was separated from Quick.  Mosley contends that Vasilakes later came up to him outside the shop and told him he should not have been fired and that he could sue.

Mosley's account of what happened inside the shop during the meeting is substantially supported by an affidavit from his father and a written declaration made under penalty of perjury from Luke Thompson, one of Mosley's crew members.  Neither of these two witnesses, however, purports to have been privy to the conversation that Mosley claims he had with Vasilakes after the meeting.

The evidence presented by Alpha presents a much different picture.  Alpha has proffered deposition testimony from Vasilakes along with his written report of the meeting, deposition testimony from five other persons who were present during the safety meeting (most of whom had previously given a written statement), and an affidavit from former superintendent Quick.[2]  While

_____

[2]  Quick was later terminated after striking a buried line with a backhoe while working for a sister company in Oklahoma.

6

the accounts of these persons vary somewhat with respect to the amount of detail provided and their level of recall, the general picture presented by Alpha's evidence is that:  Mosley began arguing with Vasilakes about Alpha not providing work gloves and that Vasilakes told Mosley he would look into it, but Mosley continued to rant about the lack of gloves and became more angry and orally abusive. It was at that point, according to these accounts, that superintendent Quick intervened and tried to calm Mosley down, telling Mosley that he needed to show Vasilakes some respect.  When this failed and Mosley continued making threats, swearing, and referring to the "F**ing Mexicans" being hired by Alpha, Quick then told Mosley he was fired and Mosley's father had to physically remove Mosley from the shop.

At least four of Alpha's witnesses testified that Mosley exhibited signs of being on something or under the influence of alcohol.  In addition, Quick, in his written affidavit, stated he could smell alcohol on Mosley's breath.

Finally, the only thing that Alpha's witnesses could specifically recall Mosley complaining about was the lack of gloves.  However, several of the witnesses acknowledged on cross-examination the possibility he may have spoken about other matters.

Mosley denies being verbally abusive with Vasilakes, making disparaging remarks about Latinos, and having had anything to drink prior to the meeting.  Finally, while Mosley agrees he became verbally and physically confrontational with Quick, he claims it was not until after Quick told him he was fired.

Mosley contends Quick fired him for blowing the whistle on the safety violations occurring on Quick's watch and also because of his earlier conversation with Quick about his medical bills and

the fact that he would have to seek workers' compensation if they were not going to be paid by Alpha.

Alpha denies that Mosley was fired for blowing the whistle on alleged safety violations or for stating to Quick he would have to seek workers' compensation for his medical bills. According to Alpha, Quick fired Mosley for being abusive and insubordinate during the safety meeting.

## II.   **ALPHA'S MOTION FOR SUMMARY JUDGMENT**

### A.   **Mosley's claim pursuant to N.D.C.C. § 34-01-20**

#### 1.   **Elements of a prima facie case**

North Dakota's "whistleblower statute" codified at N.D.C.C. § 34-01-20 provides in relevant part as follows:

> **§ 34-01-20. Employer retaliation prohibited--Civil action for relief--Penalty**
> 1. An employer may not discharge, discipline, threaten discrimination, or penalize an employee regarding the employee's compensation, conditions, location, or privileges of employment because:
>
> > a. The employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of federal, state, or local law, ordinance, regulation, or rule to an employer, a governmental body, or a law enforcement official.
>
> * * * *

To make out a prima facie case for a violation of § 34-01-20, an employee must show: (1) the employee engaged in protected activity; (2) the employer took adverse action against the employee; and (3) the existence of a causal connection between the protected activity and the employer's adverse action. Heng v. Rotech Medical Corp., 2004 ND 204, ¶ 19, 688 N.W.2d 389 ("Heng I").

#### 2.   **Alpha's argument that Mosley's report did not involve a violation of law**

Alpha contends that Mosley has failed to make out a prima facie case that he engaged in protected activity because his complaints related only to work gloves and the manner in which they

were being distributed and did not involve any violations of law.  However, while that may be Alpha's evidence, it is not Mosley's.

Mosley testified in his deposition that he complained during the December 6 safety meeting not only about the lack of gloves, but also hard hats, safety vests, taglines, and water.  In addition, he testified he complained not only about the failure of Alpha to provide this safety equipment but also specifically that taglines were not being used, the safety hazard this created, and the fact he had been injured because a tagline was not available.  As will be seen in a moment, non-use of safety equipment creates separate liabilities for an employer given the obligation imposed by OSHA's regulations upon employers for insuring that their employees are using required safety equipment, apart from whether the employer has an obligation to furnish and/or pay for the equipment.

Also, in addition to proffering his own deposition testimony, Mosley has proffered an affidavit from his father and a declaration under penalty of perjury from Luke Thompson, his former crew member.  Their testimony substantially corroborates Mosley's account of what took place during the December 6 safety meeting, including the fact that he complained about more than work gloves.[3]

---

[3] Alpha argues that the court cannot consider Thompson's declaration for two reasons.  The first is that North Dakota law governs what is required to assert a claim for punitive damages for state claims and North Dakota law, generally, does not provide for unsworn declarations under penalty of perjury in lieu of affidavits.  The problem with this argument, however, is that the admission of evidence and matters of procedure in diversity cases is governed by federal law and rules of procedure.  E.g., Bradshaw v. FFE Transportation Services, Inc., 715 F.3d 1104, 1107 (8th Cir. 2013).  And here, Thompson's declaration was made in accordance with 28 U.S.C. § 1746, which is a statutory rule of evidence that allows unsworn declarations under penalty perjury.

Alpha also complains about the fact that Thompson's statement was not turned over during discovery. However, Alpha does not dispute that Thompson was identified as a person having knowledge in Alpha's disclosure pursuant to Fed. R. Civ. P. 26.  And, while the court certainly encourages the early disclosure of this type of evidence and commends the practice of attorneys who routinely turn it over early in discovery, a strict reading of the rules would suggest this type of witness statement is "work product" and does not have to be disclosed until the time it is used in connection with a dispositive motion.  E.g., Joseph v. Las Vegas Metropolitan Police Dept., No. 2:09-cv-00966, 2011 WL 2295071, at *1 (D. Nev. June 10, 2011); Intel Corp. v. VIA Technologies, Inc., 204 F.R.D. 450, 451-52 (N.D. Cal. 2001).  That being said, if Alpha had asked, the court likely would have granted it additional time to depose Thompson

Under OSHA regulations, gloves and hard hats are classified as "Personal Protective Equipment" or "PPE."  See, e.g., 29 C.F.R. pt. 1926, subpt. E.[4]  For the construction industry, the regulations governing when gloves and hard hats must be used, when employers are required to insure that they are being used, and when employers are obligated to furnish and/or pay for the items are set forth in several different sections of 29 C.F.R. pt.1926, including:  § 1926.28 - employer responsible for employee wearing of appropriate PPE when required by the regulations; § 1926.95 - criteria for PPE equipment including that required for protection of "extremities;" and § 1926.100 - additional requirements for head protection.  See generally Employer Payment for Personal Protective Equipment, 72 Fed. Reg. 64342 (November 15, 2007).  Under the broad definition of PPE, it appears safety vests and taglines could also be classified as PPE, but, regardless, there are specific provisions that require their use that include § 1926.651(d) (safety vests) and § 1926.1417(w) (taglines).

For purposes of consideration of Alpha's motion for summary judgment, there is evidence that Mosley and his crew were engaged in swamping suspended pipe (requiring hard hats and taglines); at times were working in road rights-of-way (requiring safety vests); and at times may have been handling pipe under circumstances that created a risk of lacerations and abrasions to the hands (arguably requiring the use of gloves).  This evidence includes: (1) the testimony of Mosley and other witnesses describing the work activities of Mosley and his crew; (2) the testimony of one

---

before considering the present motions.  Parties who wait to disclose this type of evidence until the last moment face the prospect of the court granting additional time and possibly delaying the proceedings. See Intel Corp., 204 F.R.D. at 451.

[4]  Plaintiff cites to the corresponding sections in 29 C.F.R. pt. 1910 but, since Alpha is engaged in construction activity, the court must first look to pt.1926 beginning with subpt. C, which applies specifically to the construction industry.  See 29 C.F.R. §§ 1910.5(c) & 1910.12

of Alpha's current safety inspectors, who discusses when gloves, hard hats, safety vests, and taglines are used by Alpha's employees and which items Alpha currently provides; and (3) Alpha's safety manual, which specifically addresses safety gloves, safety vests, hard hats, and taglines. At a minimum, this evidence presents a fact question whether it would have been a violation of OSHA's regulations for Alpha to have failed to furnish, and/or require the use of, these items of safety equipment.[5]

In short, Mosley has presented sufficient evidence to establish a prima facie case that he reported one or more matters, which if true, would be a violation of law.[6] And, the fact there is substantial conflicting evidence simply means that a jury will have to decide what happened. E.g., Williams v. Herron, 687 F.3d 971, 978 (8th Cir. 2012) ("Summary judgment should not be granted

---

[5] There does not appear to be much question that at least some of Alpha's work activity required the use hard hats, safety vests, and taglines. Where there may be some question is with respect to gloves. If gloves were required by Mosley and his crew only for the purposes of cleanliness, protection against the elements, or, perhaps, even protection against calloused, then § 1926.95 would not have required Alpha to furnish gloves and in some instances may also not have required Alpha to insure their use. But, if the work activity of Mosley and his crew created a substantial risk of severe abrasions and lacerations to the hands, then it appears Alpha would have been required under § 1926.95 to both provide gloves and require their use. See 72 Fed. Reg. 64342, 64344-64346, 64348, 64352-64353, 64361, 64367 & 64369. However, the court need not decide this point now and the parties may want to address it further in their pretrial briefs. Finally, while the question of what is protected activity is a question of law, the answer in any particular case may depend upon the facts. And, if the relevant facts are contested, then the ultimate decision may have to be made by the jury following proper instruction by the court.

[6] Mosley contends that all he needs to prove is that he in good faith believed the matters he complained about would be unlawful if true, even if he was wrong about the law. The court is not persuaded. While § 34-01-20 does not require that Mosley have actual factual knowledge that a violation occurred and is sufficient if he suspects there was a violation, the statute clearly requires that the reported matter, if it occurred, be unlawful. See Dahlberg v. Lutheran Soc. Serv. of N.D., 2001 ND 73, ¶ 38, 625 N.W.2d 241 ("The clear purpose of N.D.C.C. § 34-01-20 is to protect employees who expose illegalities in the workplace, and we are not persuaded N.D.C.C. § 34-01-20 was intended to protect an employee who acts for a purpose other than exposing an illegality."); cf. Dinsmore v. U.S. Bank Nat. Ass'n, No. 09-2499, 2011 WL 1559407 (D. Minn. Apr. 22, 2011) (rejecting argument that it was sufficient under Minnesota's law that an employee need only have a good faith belief that the matter complained about was unlawful); Obst v. Micotron, Inc., 614 N.W.2d 196, 204 (Minn. 2000) (same). In other words, it would not be enough for Mosley to prove he in good faith believed that failing to furnish gloves was unlawful if turned out he was wrong and it amounted to nothing more than a violation of company policy or practice.

unless the moving party has established the right to a judgment with such clarity as to leave no room for controversy.")  (internal quotation marks and citation to prior authority omitted).

### 3.     Alpha's argument that Mosley's claim is barred because his job duties required that he report safety violations

Another argument that Alpha makes for why Mosley has failed to establish a prima facie case is that § 34-01-20 does not provide protection to an employee whose job duties require reporting unlawful activity, *i.e.*, there is a "job-duties exception" to the liability created by § 34-01-20.  Alpha contends that this job-duties exception applies here because Mosley's duties as a straw boss included reporting safety violations.  In support of this argument, Alpha cites to several federal cases applying Minnesota law as well to the decision of the Minnesota Court of Appeals in Kidwell v. Sybaritic, Inc., 749 N.W.2d 855 (Minn. Ct. App. 2008).

Notably, however, Alpha ignores the Minnesota Supreme Court's decision on appeal in Kidwell where both the plurality and dissenting opinions rejected the blanket job-duties exception relied upon by the court of appeals in its decision below and in prior cases.  Kidwell v. Sybaritic, Inc., 784 N.W.2d 220 (Minn. 2010) (hereinafter referred to as "Kidwell").  In that case, a plurality of the justices voted to sustain the court of appeals decision on the basis of what will be characterized here as a more limited job-duties exception.  Further, an equal number of dissenting justices concluded that Minnesota's statute (which is essentially the same as North Dakota's) does not provide for a job-duties exception.[7]  Kidwell, 784 N.W.2d at 234 (Anderson, Page, Meyer, JJ., dissenting).

---

[7]  The justice who controlled the outcome voted to resolve the case on other grounds and concurred only in the result.  Kidwell, 784 N.W.2d at 231-32 (Magnuson, C.J., concurring in the result).

For reasons articulated more fully later, the court believes it unlikely that the North Dakota Supreme Court would adopt even the more limited job-duties exception recognized by the Kidwell plurality.  But, even if this prognostication proves to be incorrect, it does not make any difference in this case for purposes of Alpha's motion for summary judgment.  This is because, even following the approach of the Kidwell plurality, it appears that its more limited job-duties exception would not apply in this case and, even if it did, it would be a question for the jury.  In order to explain why, it is helpful first to consider both the plurality and dissenting opinions in Kidwell as well as what the Minnesota court of appeals has had to say since Kidwell.

Kidwell involved an in-house company attorney who was terminated after he sent an email to several upper management personnel in which he claimed the company had been violating several laws and obstructing discovery in a civil case.  Kidwell, 784 N.W.2d at 221-22.  The jury found in his favor on his whistleblower claim, but the court of appeals reversed on the grounds that his email to upper management was in fulfillment of his job duties, relying upon its prior cases recognizing an implied job-duties exception to the liability created by Minnesota's statute.  Id. at 225.

On appeal to the Minnesota Supreme Court, the plurality in Kidwell rejected the blanket job-duties exception relied upon by the court of appeals as being too broad, noting that the language of the Minnesota statute does not explicitly provide for such an exception.  Id. at 226-27.  However, the plurality went on to conclude that, when an employee's job duties include reporting unlawful activity, the employee's job duties need to be considered in addressing the central question of whether the employee's report is made for the purpose of blowing the whistle.  Id. at 227.  The plurality held that, although reporting in fulfillment of an employee's job duties will not always preclude a whistleblower claim as a matter of law, an employee whose job duties include

13

investigating and reporting wrongdoing will need something more than the report itself to show that

his or her conduct is protected under the statute.  Id. at 228.  The plurality offered, as an example

of what might be something more, the situation where an employee submits a report outside of

normal reporting channels because of a concern that the normal chain of command will not be

responsive.  The plurality suggested this may be evidence sufficient to take a case to the jury on the

issue of whether the employee acted with the requisite intent of blowing the whistle.  Id. at 228-29.

In addition, the Kidwell plurality distinguished general employment obligations, such as an

obligation shared by all employees to report fraud and waste, from specifically assigned job duties.

Id. at 229.  The plurality stated that "a reasonable fact-finder could, depending on the evidence, infer

that an employee who makes a report based on an employment-related obligation, but not as part of

an assigned job duty, was doing so in order to expose an illegality."  Id. at 229.

After an extensive discussion of these points, the Kidwell plurality reached the merits and

concluded that the trial court had erred in not directing judgment in the employer's favor.  The

plurality concluded that, in their view, plaintiff in-house counsel had not offered something more

than his report to prove that he had acted with the intent of blowing the whistle.  Id. at 229-31.

In short, while the Kidwell plurality rejected a blanket job-duties exception, the effect of its

decision was to recognize a more limited one by its holding that an employee whose job

responsibilities include reporting wrongdoing must show something beyond the report to

demonstrate it was made for purposes of blowing the whistle and not simply in performance of job

duties.  Following Kidwell, this appears to be the interpretation placed on the plurality decision by

the Minnesota Court of Appeals.  See, e.g., Joyce v. State, Dept. of Corrections, No. A09-385, 2011

WL 67579, at **3-5 (Minn. Ct. App. Jan. 11, 2011) (unpublished opinion).

The dissenters in <u>Kidwell</u> rejected the plurality's approach based on the lack of any job-duties exception in the statute.  While agreeing that an employee must have the subjective intent of blowing the whistle in order to prevail and that an employee's job duties are relevant evidence for the jury to consider in deciding whether the employee acted with the requisite intent, the dissenters rejected the plurality's requirement that the employee must show something more than the report when the employee's job duties include reporting unlawful activity, stating that the statute imposes no such evidentiary requirement.  <u>Kidwell</u>, 784 N.W.2d at 235-243.  In particular, the dissenters stated the following:

> In Minnesota, we must consider the specific language used in the Minnesota Whistleblower Act to determine how job duties affect an employee's report of an illegality.  Looking at the specific language of our whistleblower statute, and at the case law interpreting that statute, I find no support for the plurality's adoption of the <u>Huffman</u>[v. Office of Personnel Mgmt., 263 F.3d 1341 (Fed. Cir. 2001)] test.  Moreover, I fail to see the wisdom or necessity for the rule advocated by the plurality.  In applying <u>Huffman</u>, the plurality concludes that an employee acting within the scope of his job duties can only in a very rare case possess the subjective purpose of exposing an illegality unless he presents evidence that he reported the illegality through channels other than the normal channels.  I have two primary objections to this conclusion.  First, I fail to see why the scope an employee's job duties or the particular channel through which the employee makes his report is entirely dispositive of the employee's subjective intent.  While such evidence is certainly relevant, I do not understand how the plurality concludes that this information is, alone, dispositive of good faith.  Second, I am concerned by the plurality's willingness to wade into an issue of fact—subjective intent—traditionally and wisely reserved for the jury.

> The plurality appears to indicate that only in a very rare case would an employee who is responsible for reporting illegal conduct and who reports such conduct through normal channels, be able to prove that the report was made for the purpose of exposing an illegality.  I disagree.  Rather, an employee could make a report that is within the scope of his job duties, and could report to supervisors to whom the employee typically reports, yet nonetheless the nature of the report may indicate the employee had a subjective intent to "blow the whistle."

For example, it is conceivable that an employee responsible for company compliance, with a job duty to report violations of law to a company board, could discover an illegality that is perpetuated by a highly powerful member of the company and is profitable for the company.  That employee may face a decision to: (a) make the obligated job duty report and face a high risk of termination, or (b) turn a blind eye to the illegality, not make the obligated report, and, as a result, keep his job.  Obst [v. Microtron, Inc.,] requires a plaintiff asserting a whistleblower claim to prove that any report was made in good faith, i.e. for the purpose of exposing an illegality. 614 N.W.2d [196, 202 (Minn 2000)].  I cannot conclude, as a matter of law, that an employee who chose the first option in the above scenario could *never* have the subjective intent required by Obst.  It is entirely plausible that a desire to "blow the whistle" or to expose an illegality may be the very fact that drives the employee to face the risk of termination and make the report.  Moreover, encouraging employees in difficult situations to make the report—to expose the illegality rather than cover it up—is precisely the purpose of the Whistleblower Act.

The plurality's rule imposes an arbitrary evidentiary hurdle on proving mental state—that the channel through which the report is made is somehow dispositive of the employee's mental state.  The rule is logically analogous to ruling that a jury cannot reasonably ever find that a murder suspect acted with premeditation unless the State presented evidence that the suspect drew a map to the victim's house.  Just as a map is evidence of but not dispositive of a murderer's mental state, so, too, here, the particular channel chosen by Kidwell to blow the whistle is not dispositive of his mental state.

The plurality also encroaches on the well-established role of the jury in determining subjective intent.  When a party bears the burden of proving the mental state of himself or another person, he is free to do so using any relevant, competent, admissible evidence—direct or circumstantial.  When a jury, based on a preponderance of the evidence, concludes that a person acted with a given subjective mental state—as the jury did here—the jury determination is entitled to deference of the highest degree.

> Mens rea is the particular province of the jury because it is elusive as well as subjective, and all but invariably is determined by drawing from objective facts—which may be inconsistent, fraught with ambiguity or both—inferences about a subjective matter that are informed by human experience.

People v. Fernandez, 64 A.D.3d 307, 879 N.Y.S.2d 74 (N.Y.App.Div. 2009); see also State v. Chambers, 507 N.W.2d 237, 239 (Minn. 1993) ("'Though a subjective state of mind may at times be difficult to determine, there is no mystery to mens rea, the latinism notwithstanding. Jurors in their every day lives constantly make

judgments on whether the conduct of others was intentional or accidental, premeditated or not. . . . [T]he factfinder can do this too; indeed, it is the factfinder's job to do it. . . .'") (quoting State v. Provost, 490 N.W.2d 93, 101-02 (Minn. 1992)). By establishing a legal rule that tethers a whistleblower's subjective mental state to the methods he uses to blow the whistle, the plurality ignores these important principles.

That is not to say that every report made by an employee in a compliance position is or should be a protected report. An employee in a compliance position may make many routine reports which reveal possible illegalities, but which do not suggest the employee has the purpose of blowing the whistle. Obst requires an employee asserting a whistleblower claim to prove that any report was made in good faith and for the purpose of exposing an illegality. Id. at 202. The fact finder is already charged with determining whether the evidence supports the finding of such a purpose. Id. Thus, even when an employee has an obligation to make a report because of his job duties, that report should be protected if, but only if, the employee is able to prove the report was not merely routine but, instead, was made in good faith with the contemporaneous purpose of "blowing the whistle." See id.

Id. at 237-39 (footnotes omitted). In addition, the Kidwell dissenters were of the view that plaintiff had offered evidence beyond his report that was demonstrative of an intent to "blow the whistle," contrary to the conclusion reached by the plurality that he had not. Id. at 240-41.

This court believes the North Dakota Supreme Court would reject the approach of the Kidwell plurality and find more persuasive the reasoning of the Kidwell dissenters for several reasons. First, the North Dakota Supreme Court, like the Kidwell dissenters, is likely to be troubled by the lack of any language in N.D.C.C. § 34-01-20 creating a job-duties exception, including imposition of a special evidentiary requirement for those whose job duties include reporting unlawful conduct. See also Rogers v. City of Fort Worth, 89 S.W.3d 265, 276-77 (Tex. Ct. App. 2002) (rejecting an exception based on job duties because the Texas statute does not provide one). Second, the court is likely to be concerned that the approach of the Kidwell plurality deprives employees whose job responsibilities include reporting wrongful conduct the opportunity of having

17

a jury decide what their subjective intent was in reporting unlawful conduct in cases where there is only the report.  Cf. Spratt v. MDU Resources Group, Inc., 2011 ND 94, ¶ 11, 797 N.W.2d 328 (stating that the purpose of the modified McDonnell Douglas test is to assure that the "plaintiff [has] his day in court despite the unavailability of direct evidence.") (quoting Schweigert v. Provident Life Ins. Co., 503 N.W.2d 225, 230 (N.D. 1993)); Heng I, 2004 ND 204, ¶ 26.  Finally, the court is likely also to be concerned that imposing the Kidwell plurality's special evidentiary requirement will simply lead to difficult and unnecessary disputes over whether the employee has offered something more than the report, which, as illustrated by the differing treatment of that issue by the plurality and the dissenters in Kidwell, can itself be a difficult question.

But, even if the court is wrong in this prediction, it does not make any difference with respect to Alpha's motion for summary judgment for two reasons.  First, it is not at all clear that Mosley's assigned job duties included investigating and reporting of unlawful conduct, as opposed to simply raising safety concerns, and whether any obligation he may have had were materially different from the general obligation that Alpha in its Safety and Health Manual imposes on all of its employees, which is that they "[i]dentify, correct, and report unsafe acts and conditions."  Alpha points to Mosley's testimony that, as straw boss, he was required to complete a safety report each day following the crew's daily safety meeting.  However, for all the court knows from what has been presented here, this may have been nothing more than a record-keeping function of documenting that a safety meeting had taken place and, perhaps, what was discussed.

In short, the most that can be said for Alpha's job-duties argument at this point is that there *may* be a fact issue with respect to whether Mosley's assigned job duties included reporting unlawful conduct apart from the more general obligation shared by all of Alpha's employees to voice safety

18

concerns.  As noted earlier, the <u>Kidwell</u> plurality observed this is a situation where summary judgment would be inappropriate.  <u>Kidwell</u>, 784 N.W.2d at 227-28; <u>see</u> <u>Nelson v. County of St. Louis</u>, No. A10-676, 2011 WL 382630, at *4 (Minn. Ct. App. Feb. 8, 2011) (unpublished opinion).

Second, even apart from there being a fact issue with respect to the extent of Mosley's assigned job duties, it appears clear from the deposition testimony presented by Alpha that the chain-of-command through which Mosley was expected to report was first to his foreman and then to the job superintendent.  And here, the report that Mosley claims he was terminated for having made was (1) to the "home office" person in charge of safety for the entire company, *i.e.*, outside his normal reporting channel, and (2) involved the alleged misfeasance of those directly above him in his chain of command, *i.e.*, his foreman and superintendent Quick.  This is just like the example given by the <u>Kidwell</u> plurality of a situation where a person whose job duties for reporting unlawful activity may be entitled to present a claim to the jury because the out-of-normal-channel reporting could be evidence of an intent to blow the whistle.  <u>Kidwell</u>, 784 N.W.2d at 228.  ("Where an employee with responsibility for investigating and reporting wrongdoing submits a report documenting wrongdoing outside normal channels, because the employee believes that the normal chain of command is unresponsive, that employee could be viewed as engaging in protected conduct.").

What governs in this case, of course, is North Dakota law.  Here, while the court doubts that the North Dakota Supreme Court would follow the approach of the <u>Kidwell</u> plurality over that of the <u>Kidwell</u> dissenters, the North Dakota Supreme Court is unlikely to go further than the approach of the <u>Kidwell</u> plurality and adopt a blanket job-duties exception, which, essentially, is Alpha's argument here.  For these reasons, Alpha is not entitled to summary judgment of dismissal based on its job-duties argument.

### 4. Alpha's argument that there was no violation because the "whistle had already been blown"

Alpha argues that, because Mosley professed to complaining about the lack of safety equipment to both his foreman and project superintendent Quick prior to the December 6 safety meeting, he had already "blown the whistle," so he has no prima facie case. In support of its argument, Alpha cites in particular to the Eighth Circuit's decision in <u>Wood v. SatCom Marketing, LLC</u>, 705 F.3d 823 (8th Cir. 2013). In that case, the Eighth Circuit, applying Minnesota's whistleblower statute, essentially held that no reasonable juror could have concluded that the last report of unlawful activity relied upon by plaintiff for her whistleblower claim (which was one of several at issue) was made in "good faith" for the purpose of blowing the whistle because her employer was already well aware of her charges of unlawful conduct given her numerous prior reports. <u>Id.</u> at 825-29. In other words, there was "no more whistle to blow" as plaintiff must have been well aware.

While there may be extreme cases, like <u>Wood</u>, where it could be concluded as a matter of law that a plaintiff is no longer acting in good faith in reporting unlawful activity because of the number of prior reports and to whom they were made, this is not such a case. Here, Mosley's prior complaints were to his crew foreman and the project superintendent who were at a different level of the company than Alpha's "home office" personnel to whom Mosley was speaking at the December 6 safety meeting. Morever, there is no evidence that Alpha's owner or his "home office" management personnel were aware of Mosley's complaints to foreman Sims and superintendent Quick - much less evidence so clearly establishing that Mosley was aware they knew, so that the question of whether Mosley made his report in "good faith" for purposes of blowing the whistle on

20

unlawful conduct allegedly occurring at the jobsite (including Sim's and Quick's misfeasance in allowing it to go on) could no longer be one for the jury.

In short, <u>Wood</u> and the other cases Alpha relies upon for its argument that the "whistle had already blown" are not applicable here.  The simple fact that Mosley made prior reports to his immediate supervisors does not foreclose his claim as a matter of law.  See <u>Heng v. Rotech Medical Corp.</u>, 2006 ND 176, ¶¶ 14-24, 720 N.W.2d 54 ("<u>Heng II</u>") (upholding judgment in favor of plaintiff on a whistleblower claim where plaintiff was discharged by her immediate supervisor after having raised concerns of unlawful activity repeatedly to her supervisor and then finally to others higher in the company).

### 5.     Alpha's other arguments

Alpha's additional arguments do not warrant substantial discussion since they are all based on its evidence and do not take into account Mosley's conflicting evidence.  The mere fact this court may find Alpha's evidence more persuasive at this point is not enough for the court to grant summary judgment.

### B.     Mosley's claim pursuant to N.D.C.C. § 65-05-37

Mosley claims that another reason Quick fired him was because of the conversation that he purportedly had with Quick not long before his termination during which Mosley asked Quick whether the medical expenses associated with his injury had been paid and, when Quick said nothing more would be paid, Mosley then stated he would have to file a claim with workers' compensation to get them paid.  Mosley claims this entitles him to relief pursuant to N.D.C.C. § 65-05-37, which reads as follows:

**§ 65-05-37. Retaliation by employer prohibited--Action for damages--Penalty**

21

> An employer who willfully discharges or willfully threatens to discharge an employee for seeking or making known the intention to seek workforce safety and insurance benefits is liable in a civil action for damages incurred by the employee, including reasonable attorney's fees. Damages awarded under this section may not be offset by any workforce safety and insurance benefits to which the employee is entitled. A willful violation of this section is a class A misdemeanor.

There does not appear to be any reported North Dakota cases applying this statute, which was enacted in 2003 after the North Dakota Supreme Court recognized the availability of a tort claim for similar conduct in Krein v. Marian Manor Nursing Home, 415 N.W.2d 793, 795 (N.D. 1987). However, there is no reason to believe that the elements previously set forth for a claim under N.D.C.C. § 34-01-20 would not be applicable here.

Alpha presents several arguments for why Mosley has failed to make out a prima facie case for his claim pursuant to § 65-05-37. Essentially, these all relate to whether Mosley has presented sufficient evidence to demonstrate on a prima facie basis the existence of a causal connection between the protected activity of making known to Quick his intention of seeking workers' compensation benefits and his firing.

One of the arguments that Alpha makes is that Mosley had filed an application for benefits approximately a month earlier when he was injured and he was not terminated by Alpha at that time. This argument, however, ignores what happened thereafter as well as the fact that what is critical here are Quick's motivations and not anyone else's in Alpha, since Quick was the one who fired Mosley.

Although Mosley did file an application for workers' compensation benefits when he went to the doctor to get checked out on his injury, he subsequently came to an agreement with the owner of Alpha for temporary compensation and payment of his medical bills in lieu of his pursuing

22

workers' compensation benefits and there is no indication that Mosley attempted to collect benefits until after he was terminated.  Hence, the fact he was not discharged following his initial claim for benefits is of little relevance here since not only was the subsequent agreement made, it was made with Alpha's owner and not Quick.  Further, the fact that upper management may have still been intending on fulfilling its agreement with Mosley would be beside the point since what is critical here are Quick's motivations for the reason already articulated.

Alpha also argues its evidence that Mosley was fired because he was abusive and insubordinate at the safety meeting at which he was fired.  However, this evidence is disputed as discussed in connection with Mosley's whistleblower claim.

Finally, Alpha argues that the temporal relationship between the alleged protected activity and Mosley's discharge is not sufficient to imply the requisite intent, even for a prima facie case.  The court disagrees - at least based on the evidence before it now, which includes the other statement purportedly made by Quick during the same time frame about what the company would be facing if Mosley was again injured.  Cf. Heng II, 2006 ND 176, ¶¶ 18-19 (sufficient evidence existed to find causal connection between plaintiff's report and her termination fourteen days later).

In summary, the court is going to allow Mosley's claim pursuant to § 65-05-37 to go forward at this point, but may reconsider at trial whether it will actually be presented to the jury.  While Mosley's claim pursuant to § 65-05-37 is more tenuous than the claim that he was discharged for reporting safety violations, the court believes that a prima facie case has been established.  Further, if Mosley is able to overcome Alpha's substantial evidence that he was discharged because he was abusive and insubordinate (which may be difficult based on the totality of the evidence proffered so far), the court is not prepared to say now that no reasonable juror could conclude that part of

Quick's motivation for firing Mosley was related to (1) his statement to Quick that he would file for worker's compensation benefits, and (2) his complaints about the safety violations.

### III.    MOSLEY'S MOTION TO AMEND TO REQUEST PUNITIVE DAMAGES

N.D.C.C. § 32-03.2-11(1) governs the pleading of a request for punitive damages in North Dakota cases.  This court has previously construed this statute as providing substantive rights and has applied it in diversity cases when punitive damages are sought for state law claims.  E.g., Atkinson v. McLaughlin, No. 1:03-cv-091, 2007 WL 557024, at *7 (D.N.D. Feb. 15, 2007) (citing other cases) ("Atkinson").

In this case, the court has concluded that Mosley has made out a prima facie case for retaliatory discharge.  Further, there is evidence sufficient to support a finding by a preponderance of the evidence of one or more of the elements of oppression, fraud, or malice required for an award of punitive damages under North Dakota law if the jury chooses to believe that evidence and not believe other evidence.  This satisfies § 32-03.2-11(1)'s requirements as previously applied by this court.  E.g., Atkinson, 2007 WL 557024 at *8 (holding plaintiff was required under § 32-03.2-11(1) to demonstrate "that there is a factual basis for a claim of punitive damages and whether there is sufficient evidence to support a finding by the trier of fact that a preponderance of the evidence proves oppression, fraud, or actual malice" and plaintiff was not required to prove his or her claim because "[t]o require so would usurp the fact-finding province of the trier of fact");  Olson v. Ford Motor Co., Civ. No. A4-04-102, 2005 WL 3271945, at **2-3 (D.N.D. Nov. 29, 2005) (same).

For example, there is the evidence outlined previously, if the jury chooses to believe it, that Quick fired Mosley for having blown the whistle about the lack of certain safety equipment on the project that Quick was responsible for, that Quick had directed Mosley to work without the safety

equipment, and that Quick  was well aware that the equipment was required for purposes of safety if not also by law.  From this evidence, the jury could conclude that Quick acted oppressively or with actual malice as those terms are used in § 32-03.2-11.  See Atkinson, 2005 WL 3271945 at *7 (defining the terms); Ingalls v. Paul Revere Life Ins. Group,  1997 ND 43, ¶¶ 43-45, 561 N.W.2d 273 (the term "malice" encompasses the intentional violation of a legal duty in conscious disregard of a plaintiff's rights and the term "oppression" encompasses acting intentionally to cause another hardship).

Consequently, plaintiff will be permitted to amend his complaint to seek punitive damages. However, given the nature of the case and the sharp conflict in the evidence, the court will bifurcate the issue of punitive damages and submit it to the jury only if the jury returns a verdict in Mosley's favor.

## IV.   **ORDER**

Alpha's motion for summary judgment (Doc. No. 24) is **DENIED**.  Mosley' motion seeking leave to assert punitive damages (Doc. No. 26) is **GRANTED**.   Mosley shall file an amended complaint seeking punitive damages.  Alpha need not file an amended answer as the court will deem the matter to be contested.  Further, the issue of punitive damages will be bifurcated and submitted to the jury separately if a verdict is returned in favor of Mosley.

**IT IS SO ORDERED.**

Dated this 2nd day of August, 2013.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr.
United States Magistrate Judge

25